**Edward L. HALL, Dr., on his own behalf and on behalf of all other persons similarly situated, Plaintiff–Appellant,**

**Cordelia B. Moffett, Dr., on her own behalf and on behalf of all other persons similarly situated, Plaintiff,**

v.

**ALABAMA ASSOCIATION OF SCHOOL BOARDS, Sandra Sims–Degraffenreid, in her official capacity as Executive Director of the Alabama Association of School Board, Ed Richardson, Dr. in his official capacity as Alabama State Superintendent, et al., Defendants–Appellees.**

No. 02–14023.

United States Court of Appeals, Eleventh Circuit.

March 28, 2003.

Gray, Fred D., Gray, Langford, Sapp, McGowan, et al., Tuskegee, AL, Blacksher, James U., Attorney at Law, Birmingham,

---

AL, Chachkin, Norman J., NAACP Legal Defense & Educ'l Fund, Inc., New York, NY, for Appellant.

Woods, Melissa Sharon, NAACP Legal Defense Fund, New York, NY, Sweeney, Donald B. Jr., Bradley, Arant, Rose & White, Stewart, Hope T., Bradley, Arant, Rose & White, Birmingham, AL, for Appellee.

Davis, Terry Glenn, Terry G. Davis, P. C., Montgomery, AL, Jones, Elaine R., NAACP Legal Defense & Educational Fund, Inc., Browne–Marshall, Gloria J., New York, NY, Proll, Leslie Marie, NAACP Legal Defense & Educational Fund, Washington, DC, Adams, John W. Jr., Thomas, Means, Gillis et. al, Pitters, Amardo Wesley, A. Wesley Pitters, P.C., Montgomery, AL, Still, Edward, Dickstein, Shapiro, Morin & Oshinksy, LLP, Washington, DC, Stokes, Theron, Alabama Education Association, Boyd, David R., Balch & Bingham, Walker, Dorman, Montgomery, AL, for Initial Service.

Before DUBINA and FAY, Circuit Judges, and DOWD *, District Judge.

PER CURIAM:

This is an appeal from a judgment entered in favor of the defendants after a bench trial wherein appellant Dr. Edward L. Hall alleged race discrimination. After reviewing the record, and having the benefit of oral argument, we affirm the district court's judgment based on its well-reasoned memorandum opinion filed on December 27, 2001, and attached hereto as an appendix.

AFFIRMED.

## APPENDIX

### OPINION

MYRON H. THOMPSON, District Judge:

This lawsuit commenced on June 11, 1996, with the filing of a complaint by plaintiff Edward L. Hall, a longtime administrator and assistant superintendent in the Talladega County, Alabama, school system. Hall sought appointment as the new superintendent of education for Talladega County, and when passed over for that position sued and named as defendants the Talladega County Board of Education and the three-member school board majority (Eddie McLain, Randy Howell, and Johnny Ponder) who did not support him, along with the Alabama State Superintendent of Education, the Alabama Association of School Boards, and the association's executive director. Larry Morris and Joe Duncan, the remaining two board members, did support Hall to varying degrees and were not named as defendants. Hall, who is a black male, charges violations of the thirteenth and fourteenth amendments to the United States Constitution, as well as Titles VI and VII of the Civil Rights Act of 1964, as amended (42 U.S.C.A. §§ 1981a, 2000d & 2000e through 2000e–17), and 42 U.S.C.A. §§ 1981, 1983. Based on the evidence presented at a non-jury trial, the court finds in favor of the defendants and against Hall.

## I. BACKGROUND

This recitation of the factual background of the case is drawn from the parties' joint

---

* Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

stipulations as well as the evidence the court found most credible.

After serving as the superintendent of education for the Talledega County school system for approximately two decades, Lance Grissett notified the board of his intent to retire in the autumn of 1995. In Talladega County, as in many other counties in Alabama, the superintendent of education is appointed rather than elected. In those counties, the board of education is charged by statute with the responsibility of appointing a new superintendent. 1975 Ala.Code § 16–8–7.

Having no experience, individually or collectively, with conducting a superintendent search, the board authorized the chairperson, in November 1995, to contact the Alabama Association of School Boards and enlist its assistance in the search process. The association subsequently aided the board by staging an informational meeting on the search process; preparing a brochure announcing the vacancy; placing advertisements and notices of the opening in regional and national professional publications; contacting an extended list of persons who had previously indicated their interest in being notified should a superintendent position become available in Alabama; receiving and compiling statements of interest from candidates and forwarding them to the board's attorney; and recommending a list of consultants the board could choose from to aid in the selection process.

McLain, the new board chairperson, selected Ed Whigham to serve as a consultant in a limited capacity. State Superintendent Richardson had no involvement in the search process at all.

The board subsequently resolved itself into subcommittees to work on different aspects of the selection process. Board members Duncan and Ponder prepared a recommendation, later approved by the full board, of qualifications and characteristics to be sought in a new superintendent. These qualifications were used in the announcement brochure itself, by the selection committee of board members McLain and Howell and advisor Whigham to evaluate all the candidates' statements of interest and select finalists, and by the full board during interviews of the finalists.

The qualifications sought from applicants were of three orders: those they were required to have, those they should have, and those that were preferred of them.

Candidates were required to meet the state statutory criteria of eligibility for this office, which include a state certificate in administration and supervision, three years of experience as a teacher, administrator or principal within the last five years, and a college degree, 1975 Ala.Code § 16–9–2; to have the ability to view all aspects of issues and deal fairly with diverse views; to have the ability to delegate authority; to have demonstrated high ethical standards and integrity; to have a vision for the future of the school district, and the ability to communicate that vision; to be a strong disciplinarian; to be an effective financial and personnel manager; and to have demonstrated ability in curriculum development.

The successful candidate, according to the selection criteria, should be accessible to diverse groups and should have the ability to inspire confidence and promote high standards of performance.

Finally, it was preferred that the superintendent, among other things, hold a doctoral degree, have experience in kindergarten–through–grade–12 administration, and have three years of actual teaching experience.

McLain and Howell, with the aid of Whigham, initially selected six finalists from among the 25 applicants in the original pool. Whigham made no recommendations of finalists, but merely advised the board on the applicant's qualifications, and later did some background checking on the character and reputation of the selected finalists who were from outside Talladega County.

Hall was among these six finalists, and indeed he makes no allegation that the selection process was tainted by racial motives or bias through the stage of selection of finalists.

Peggy Connell was also among these finalists; she had most recently held the positions of director of instruction for the Tarrant City, Alabama, school system, and principal of Tarrant City High School. The finalists were not ranked in any manner. Three alternates were also chosen; they were ranked by the selection committee, and first among them was William Gardner. Gardner had previously held superintendent positions in school systems larger than Talladega County's, but outside Alabama. Despite his superior experience, he was not initially selected as a finalist because several board members had misgivings about what kind of longevity they could expect from someone who had already retired from a prior superintendent post. They did not want to have to repeat the search process after only a few years.

After board members, including Ponder and Duncan, expressed concern to McLain that the screening committee might not have selected the best list of final candidates, McLain encouraged board members who had not participated in the selection of finalists to review the non-finalists and select any other candidates whom they thought deserving of an interview. In this way, Gardner came to be added to the list of finalists. In the meantime, the only other local finalist, Dan Payant, withdrew from consideration. It is a disputed issue among the board members whether Gardner was added specifically because of the withdrawal of Payant, but this dispute is of no moment.

Between April 2 and 12, 1996, each of the six remaining finalists was invited to come to Talladega for an interview and public reception, and each spent part of the day of the interview in the company of one or more board members, visiting schools around the county, and meeting people informally. This gave board members, community members, and candidates a chance to get to know one another better.

The board members kept individual tally sheets on each person interviewed. Gardner was the last to be interviewed, on April 12, and afterward the full board went into executive session to discuss the reputation and character of all the finalists. The board deliberated briefly on the candidates, but no preferences were discussed. The board members had agreed early on in the process, at the recommendation of the Alabama Association of School Boards, that they would try their best to achieve unanimity on their choice of superintendent.

A series of one-on-one conversations took place over the following weekend, April 13 and 14, in person or by telephone, between McLain and each of the other board members. The conversations revolved around discovering or forming a consensus on which candidate to offer the superintendent position. The Alabama sunshine law prohibited their meeting in larger numbers (a quorum) to conduct

board business on a nonpublic basis.[1] As a result, chairperson McLain acted as a clearinghouse, or hub, in the sense that he knew what every other board member had to say, but each other board member, as a practical matter, relied on McLain to represent to him where his fellow members' preferences stood. Because these conversations turned out to be the heart of the actual, final selection process, they will be examined in close detail.

McLain testified that he told other board members that, based on the cumulative scoring from their individual tally sheets from the interviews with the candidates, as compiled by the board attorney, the choice was coming down to Hall, Connell, or Gardner, and that he personally supported Connell, but would be willing to vote for Gardner for the sake of board unity.

McLain met first with Morris, the board member with, by far, the longest tenure, to sound him out on where he thought matters stood. Morris told McLain that he thought Gardner was very qualified, that he was also very impressed with Connell, but that his first choice was Hall. He wanted to see Hall selected, not just because of his excellent credentials, but also as a reward for his longstanding good service to the system, and for the positive example it would set to appoint a black person to such an important position.

McLain spoke next to Ponder. Before McLain spoke to him, Ponder thought most highly of Gardner and another candidate, Harvey Sanford, and ranked both Hall and Connell just below them. Having been reassured by Whigham that all of the finalists were very well qualified, he also felt confident that he could not go wrong by supporting any of these candidates. He asked McLain where other board members stood, and McLain told him that he had only spoken to Morris so far, and he had the impression that Morris would support Gardner, though Hall was his "sentimental favorite." This characterization of Morris's views does not closely conform with Morris's testimony, in deposition and at trial, that he made it very clear to McLain that Hall was his first choice.

McLain proceeded to ask Ponder what his feelings were on Gardner, to which Ponder responded "wonderful." Though Ponder said he was also impressed by Connell and Sanford, they apparently did not discuss Hall—a notable omission, given that Hall and Connell were about even in Ponder's mind at that point, and that the only board member McLain had spoken to before Ponder expressed a decisive preference for Hall.

In fact, Morris, knowing, as every other board member undoubtedly did, that Duncan also would support Hall, and believing Ponder was the least committed to any candidate, attempted to persuade Ponder,

---

1. The Sunshine Law, 1975 Ala.Code, § 13A–14–2, reads:

"(a) No executive or secret session shall be held by any of the following named boards, commissions or courts of Alabama, namely: Alabama public service commission; school commissions of Alabama; board of adjustment; state or county tax commissions; any county commission, any city commission or municipal council; or any other body, board or commission in the state

charged with the duty of disbursing any funds belonging to the state, county or municipality, or board, body or commission to which is delegated any legislative or judicial function; except, that executive or secret sessions may be held by any of the above named boards or commissions when the character or good name of a woman or man is involved."

See also Dale v. Birmingham News Co., 452 So.2d 1321, 1323 (Ala.1984).

at some point during that weekend, to join them in voting for Hall, but did not succeed. Morris did not also try to recruit Howell.

McLain spoke next to Howell. Howell preferred Connell, and, like Ponder, ranked Sanford very highly, but, when McLain told him the votes "would be there" for Gardner, agreed that Gardner would be a good choice if the votes fell in his direction. In reference to Hall, Howell said that he would not "stand in the way of" any preference of a majority of the board. In other words, Howell would have at least followed a vote for Hall. Again, the consensus for Gardner was more a matter of what McLain was reporting to board members about each other than what they were reporting to him. If it is true, as McLain later represented in deposition and at trial, that he and Howell preferred Connell from the very beginning, it is hard to see where the opposition lay, at that early point, to the emergence of Connell as the consensus choice. No one had spoken less than highly of her, and no one ranked her low on their personal scale. If indeed McLain went out of his way to eliminate his own preference for Connell from the board's initial, piecemeal deliberations, his later, outspoken, adamant and unyielding support for Connell, after Gardner's withdrawal, represented a remarkable shift in demeanor, from facilitator and consensus builder to queenmaker; or else, in fact, his allegiance to Connell was late blooming.

Though he had not yet spoken to him that weekend, McLain already could tell, or easily infer, that Duncan would support Hall. He had heard Morris speak in favor of Hall, had heard Howell say he would at least follow a vote for Hall, and had not even discussed Hall with Ponder. The court concludes that the groundwork was

there to mobilize a compromise vote in favor of Hall, had McLain himself chosen to go, and lead the rest of the board, in that direction. As he testified at trial, McLain "felt that [Gardner] would be the best qualified candidate if I wasn't going to get the choice I wanted, and Peggy Connell was that, I felt that Dr. Gardner would be the best candidate." Evidence also suggests, however, that Gardner was clearly ranked first or second in every board member's mind, and therefore, as a practical matter, was an entirely proper compromise candidate.

McLain met with Duncan last, having already lined up support for a compromise vote for Gardner, his own clear second choice, and presented that option to Duncan as the net result of where the other board members stood. Duncan made it clear to McLain that he would vote for only Hall, though McLain asked him to consider voting with the majority for the sake of board unity. McLain told Duncan that either Connell or Gardner would be nominated, but not Hall. After prolonged discussion, Duncan relented and said he would vote favorably in a confidence motion if someone else were selected, but would vote for and make a public statement in support of Hall. In the end, Duncan had to pencil in Gardner's name in his prepared statement supporting Hall, because he did not know for sure whether Gardner or Connell would be nominated.

At no time did McLain ever consider voting for Hall as a compromise candidate. Morris also had the impression that McLain was "soliciting" votes from the other board members in order to find a consensus candidate. Indeed, once McLain thought Gardner would succeed as the consensus candidate, he called an official board meeting for the next day, April 15.

At that meeting, Gardner was nominated and elected by a 4–1 vote to become the new superintendent. Duncan voted against Gardner's selection, and read a prepared statement at the public board meeting after the appointment was announced, indirectly charging members of the board with racial prejudice against Hall, and with improprieties in the selection process. Duncan also contacted and made statements to the press along the same lines. Duncan did vote with the majority of the board, as promised, in a subsequent confidence motion.

After the appointment was announced, a private citizen of Talladega County called Gardner at home and told him that there would be racial problems if he came to Talladega County, and discouraged him from accepting the position. The private citizen testified at trial that he was motivated by the belief that Hall was best qualified for, and should have been appointed to, the superintendent's position.

The local Talladega newspapers were highly critical of the board's decisionmaking process, and reprinted Duncan's statement verbatim. There was also announcement of a public silent protest against the board, in support of Hall, to be held at the next regularly scheduled board meeting, on April 18. Some board members were worried about how long they would have to continue to hold meetings at which people were demonstrating and displaying protest signs.

In a phone call and letter to McLain on Sunday, April 21, Gardner declined the appointment, stating that he felt he lacked clear endorsement and support from the board and the community.

McLain once again, and with great alacrity, orchestrated a series of meetings or phone calls with each of the other individual board members to find a replacement for Gardner. He just received the bad news from Gardner on April 21, and yet managed to convey the news to all members of the board, hold a new round of talks, and call a board meeting to select a new superintendent for April 23, just two days later.

On this second go-round, both Morris and Duncan again conveyed to McLain their unequivocal support for Hall. McLain and Howell both felt unwilling to support Hall, having purportedly surrendered their top choice, Connell, the first time around to support Gardner as the compromise candidate. McLain met with Ponder to ask about his feelings about Connell, and Ponder said he did not have any problem with her, that he was excited about her. Again, McLain and Ponder discussed no other candidates, except McLain did tell Ponder that Duncan supported Hall. Although Ponder testified that he was as prepared to compromise in favor of Hall as he was Connell during the first round (though Morris's account of his attempt to recruit Ponder's vote for Hall suggests otherwise), by this point Hall had slipped downward in his estimation. At trial, for the first time, Ponder revealed that after the Gardner vote, on the evening of the public board meeting at which there was a silent protest, he approached both Hall and his wife to greet them, and each, separately, snubbed him, or so he felt. Regarding this as a true indication of a disagreeable trait in Hall's character, he was no longer as willing, during this second round, to compromise for Hall as he was for Connell. Similarly, though Howell testified that he was ready to join a consensus for either Sanford or Hall the first time around, he became unwilling to do so the second time around. Though he claimed the controversy over the process and protest at the board meeting had no

bearing on his decision, somehow he became of the "mind-set" that the time for give-and-take was over, and it was time to push for closure, and for Connell.

At this point, with the entire process having eaten up seven months, the press clamoring about Duncan's allegations of racial bias, and in the wake of a public silent protest in support of Hall, the board members became entrenched in their various positions. Duncan told McLain that this time he would not join a support motion if Hall were not chosen. McLain would vote for no one but Connell, and knowing Howell and Ponder would vote with him, gave no consideration to joining Morris and Duncan in supporting Hall—board unanimity was no longer a prime consideration. Once assured that a majority of the board, himself included, supported Connell, his top candidate, McLain immediately called another meeting to end the process swiftly. In fact, without McLain's vote, there was no board majority, but a split between Hall and Connell supporters, and so in no way was McLain still acting as a facilitator for the board's decision, if indeed he ever had been. As the chairperson and the point-person for all deliberation on the candidates, McLain was uniquely and powerfully positioned to exert his will on the outcome and see his own candidate selected.[2]

Neither time around, despite mounting divisiveness and controversy, did the board members seek out a plenary way to discuss the merits of the candidates or whether and how to address the concerns of the public about their selection process. This is, at the minimum, evidence of a defect or breakdown in the selection process, possibly due to a lack of interest in hearing and openly discussing one another's points of view, and it tainted the process with intrigue and opened the door to impropriety, whether or not that door was stepped through.[3] In general, some board members expressed their conviction that the board had been divided, on philosophical or policy grounds, for quite some time, and that the selection process was an opportunity for harmony and reconciliation, one that, however, totally backfired.

When the board next convened, on April 23, it voted 3–2 in favor of appointing Connell, with Duncan and Morris voting for Hall. A vote to pledge support for Connell was then taken, with only a single dissenting vote cast, by Duncan. Duncan and Morris had floored a motion to defer the vote so that further deliberations could occur first, but that motion was defeated by the three Connell supporters.

Hall filed a charge of discrimination with the Equal Employment Opportunity Commission, claiming race discrimination by the board for failing to appoint him superintendent, and then filed this lawsuit.[4] Hall's complaint asserts that the board, as a political matter, feared appointing a

2. Interestingly, the private citizen who had dissuaded Gardner tried again to intervene ex parte with the board's chosen candidate by traveling unannounced to Tarrant City to confront Connell and try to dissuade her from accepting the position because of racial tension in the county. Instead, Connell spoke at length with him in her office and managed to convince him that she could deal with and would relish the challenge of the office and working with all members of the community.

3. Every board member testified that they did not discuss their ideas with other, particular members of the board because they felt it would be of no use—either those others' minds were made up, or they themselves refused to yield when they had determined for themselves who the best candidate was.

4. Hall also asserted an age-discrimination claim in the administrative claim but it was dropped from the lawsuit.

black person to the position, and so deviated in important respects from its own established selection procedures in order to devise a pretext for not selecting him. The complaint also asserts that the Talladega School Board participated in a state-wide pattern and practice of appointing only white superintendents of education in white-majority school systems in Alabama, and that this practice is a vestige of the history of state-enforced segregation and white supremacy. The local school board, as a governmental actor of a State that once enforced a de jure system of racial segregation in its school systems, is said by Hall to have failed in its continuing legal duty and obligation to abolish all vestiges of racism and segregation in the school system.

## II. LEGAL STANDARDS AND ANALYSIS

### A.

#### i.

Title VII provides that, "It shall be an unlawful employment practice for an employer ... to fail or refuse to hire ... any individual ... because of such individual's race." 42 U.S.C.A. § 2000e–2(a). Under the 1991 amendments to this Act, "an unlawful employment practice is established when the complaining party demonstrates that race ... was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C.A. § 2000e–2(m). In addition, the 1991 amendments provide that, "On a claim in which an individual proves a violation ... and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court ... (i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and

attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e–2(m) ...; and (ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment." 42 U.S.C.A. § 2000e–5(g)(2)(B). Thus, under these amendments, if the employee shows merely that race was a motivating factor, he has established liability and thus may be entitled to some relief. Whether the employer has met its "same action" burden of proof would go to the nature of the relief available.

In considering a claim of discrimination, the court must go through a two-step fact-finding process. In the first step, the court must determine whether the employee has proved by a preponderance of the evidence that the employee's race was a motivating factor for the employer's decision, even though other factors also motivated the employer. If the employee has shown this fact by a preponderance of the evidence, then liability is established and the court must go to step two of the process. At step two, the court must determine whether the employer has proved by a preponderance of the evidence that it would have taken the same adverse employment action against the employee even in the absence of the impermissible factor.

An employee may prove a violation of Title VII with either circumstantial or direct evidence. However, the court heard no credible direct evidence that improper consideration of race played a role in this hiring decision.

#### ii.

With regard to circumstantial evidence of improper consideration of race, in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court "established an allocation of the burden of production and

an order for the presentation of proof in Title VII discriminatory-treatment cases." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 2746, 125 L.Ed.2d 407 (1993). Under the *McDonnell Douglas* approach, an employee has the initial burden of establishing a prima facie case of unlawful discrimination by a preponderance of evidence. 411 U.S. at 802, 93 S.Ct. at 1824. A "prima facie case requires 'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion.'" *Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). "[A] plaintiff establishes a prima facie case of race discrimination under Title VII by showing: (1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job. Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno,* 115 F.3d 1555, 1561–1562 (11th Cir.1997) (citations omitted).

If the employee establishes a prima facie case, the burden then shifts to the employer to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the employer discriminated against the employee. This may be done by the employer articulating a legitimate, non-discriminatory reason for the employment decision, which is clear, reasonably specific, and worthy of credence. The employer has a burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Department of Com-munity Affairs v. Burdine,* 450 U.S. 248, 253–55, 258, 101 S.Ct. 1089, 1093–94, 1096, 67 L.Ed.2d 207 (1981). "If the trier of fact finds that the elements of the prima facie case are supported by a preponderance of the evidence and the employer remains silent, the court must enter judgment for the plaintiff." *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 311, 116 S.Ct. 1307, 1309, 134 L.Ed.2d 433 (1996).

Once the employer satisfies this burden of production, the employee then has the burden of persuading the court that the proffered reason for the employment decision is a pretext for discrimination. The employee may satisfy this burden either directly, by persuading the court that a discriminatory reason more than likely motivated the employer, or indirectly, by persuading the court that the proffered reason for the employment decision is not worthy of belief. By so persuading the court, the employee satisfies his ultimate burden of demonstrating by a preponderance of the evidence that he has been the victim of unlawful discrimination. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

However, where, as in this case, the court has conducted a full trial and has sufficient evidence to determine whether an employee has been a victim of discrimination, the court need not go through the *McDonnell Douglas* burden-shifting process and should instead reach the ultimate issue of discrimination. "If . . . the defendant has succeeded in carrying its burden of production, the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant. . . . The presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture." *St. Mary's Honor Center,* 509 U.S. at 510–511, 113 S.Ct. at 2749. *See also United States Postal Service Board of Governors v. Aikens,* 460 U.S.

711, 716, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983); *Powers v. Alabama Department of Education,* 854 F.2d 1285, 1290 (11th Cir.1988), *cert. denied,* 490 U.S. 1107, 109 S.Ct. 3158, 104 L.Ed.2d 1021 (1989).

Moreover, the Supreme Court announced the *McDonnell Douglas* approach before the 1991 amendments to Title VII. Under *McDonnell Douglas,* the burden of persuasion never shifts from the employee or plaintiff. However, under the 1991 amendments, to establish liability, the employee need only show "that ... race ... was a motivating factor for any employment practice, even though other factors also motivated the practice," 42 U.S.C.A. § 2000e–2(m), and then, to avoid the full array of remedies, the employer must "demonstrate[ ] that [it] would have taken the same action in the absence of the impermissible motivating factor." 42 U.S.C.A. § 2000e–5(g)(2)(B).

Nonetheless, the *McDonnell Douglas* analysis may still be helpful in fully tried cases to which the 1991 amendments apply and in which the employee relies on circumstantial evidence. Such cases pose "difficult" and "sensitive" issues of subjective intent and objective action. *Aikens,* 460 U.S. at 716, 103 S.Ct. 1478, 75 L.Ed.2d 403. The *McDonnell Douglas* analysis provides an invaluable method of "progressively ... sharpen[ing] the inquiry into the elusive factual question of intentional discrimination." *Burdine,* 450 U.S. at 255, n. 8, 101 S.Ct. at 1094, n. 8. Positing such elementary *McDonnell Douglas* questions as whether the elements for a prima facie case are present (in particular, whether the plaintiff was treated differently from a similarly situated person of a group different from that to which the plaintiff belongs), the clarity and nature of the employer's justification, and whether the justification is pretextual and, if so, whether it is a pretext for discrimination, would help to assure that, in resolving the Title VII claim—and, in particular, in resolving the ultimate issues of whether race was a motivating factor for the decision by the employer, even though other factors also motivated the employer, and whether the employer would have taken the same adverse employment action against the employee even in the absence of the impermissible factor, 42 U.S.C.A. §§ 2000e–2(m), 2000e–5(g)(2)(B)—the court arrives at its ultimate conclusions less through intuition and more through factual reasoning and analysis. *See, e.g., Noble v. Alabama Dept. of Environmental Management,* 872 F.2d 361, 365 n. 4 (11th Cir. 1989); *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1184 (11th Cir.1984). However, because the *McDonnell Douglas* analysis is only a "procedural device," *St. Mary's Honor Center,* 509 U.S. at 521, 113 S.Ct. at 2755, it should not be applied too rigidly; nor should it be viewed as an end in itself. For example, the mere disbelief of the employer's proffered reason does not "compel" a finding of discrimination. *Id.* at 511, 113 S.Ct. at 2749. In other words, the *McDonnell Douglas* approach should not be used by the court as a "substitute" for reaching the ultimate issue of whether the employee has, in fact, been a victim of discrimination. *Moore v. Alabama State University,* 864 F.2d 103, 105 (11th Cir.1989).

iii.

However, recently and in perhaps one of its more important decisions on discrimination law, the Eleventh Circuit Court of Appeals has repeatedly held that, where a claim of discrimination is based on relative qualifications, " 'disparities in qualifications are not enough in and of themselves to demonstrate discriminatory intent unless those disparities are so apparent as virtu-

ally to jump off the page and slap you in the face.'" *E.g., Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1268 (11th Cir.2001) (quoting *Deines v. Texas Dept. of Protective and Regulatory Servs.*, 164 F.3d 277, 280 (5th Cir.1999)).

#### iv.

Hall is undeniably a member of a protected class. The board at no time and in no way disputes that he is qualified for the position of superintendent of education for Talladega County. Hall was passed over for appointment in favor of a white person. This set of circumstances supports an inference of discrimination. Hall makes out a prima facie case that he was discriminated against, on account of his race, in the board's decision whom to hire as the next superintendent of education in Talladega County.

The members of the board majority proffered a set of narrative accounts of the hiring process, purporting to show how it came about, for legitimate, nondiscriminatory reasons, that the board hired, first, Gardner, and, then, Connell, as superintendent, instead of offering the position each time to Hall. The facts surrounding the final stages of the board's hiring decision, as exhaustively recited above, lead the court to the conclusion that, in the final stages of the decision-making process, Gardner and Connell were favored over Hall.

Board chairperson McLain's words and deeds, which have been examined in great detail, show that he never, despite Hall's highly competitive credentials, considered either voting for him as a compromise candidate or encouraging other board members to consider his candidacy favorably; whereas he did both for both Gardner and Connell. The court finds that Hall had sufficient support from board members for McLain legitimately to have taken both of those actions. But the critical question is what lay behind McLain's actions. That McLain engaged in Machiavellian actions does not mean that he did so for racial reasons. The school board is a political body, and that a board member would act to advance his own preferences would be expected. The evidence that goes primarily to whether McLain based his preferences on anything other than qualifications is the evidence of the candidates' qualifications.

The hiring process consisted of essentially three distinct stages. The first stage was a weaning process of going through all the statements of interest, using the announced criteria, to arrive at a list of final candidates deemed worthy of further consideration for appointment to the position. As said earlier, Hall does not challenge this phase of the process. With regard to the later stages, the parties barraged the court with expert reports, paper audits, and such, in an effort to sell Hall, or Connell, or Gardner, as the best qualified candidate, to support their positions in this litigation. Much argument was made whether a particular candidate had standout credentials that placed him or her head and shoulders above the other finalists. The court cannot say that the disparities between Hall's and Gardner's or Connell's paper qualifications are so apparent as virtually to jump off the page and slap one in the face.

In addition, whether any candidate was the frontrunner on paper or not, once the interviews and visits began, other important elements entered the picture that also necessarily weighed heavily in the final decision. The court finds highly credible the testimony of Whigham, who has both taught about superintendency in graduate education programs and participated in many superintendent searches,

that once board members are presented with a slate of finalists, they must decide with whom they can establish a satisfactory and effective working relationship. Whigham testified that ranking or expressing preferences for one candidate over another before this "get to know one another" stage, based solely on paper credentials, could be futile or even counterproductive, since the synergy or chemistry between the superintendent and the board, no matter how intangible or "subjective" a determination that may be, is crucial.

Furthermore, certain human qualities that are most desirable in a superintendent, such as vigor, genuine interest in the welfare of children, and ability to lead, inspire, and communicate, must be assessed in person, and not entirely in dependence on definable or measurable criteria, such as are amenable to presentation on paper. The whole point of hiring a superintendent is to find a qualified person who can work with the board productively to implement policy and lead the school system. Improvement takes time, and the time a superintendent has to advocate for and carry out changes in programming and procedure is directly contingent on his ability to communicate and work with the board. The superintendent is the executive officer and agent of the board. If a superintendent is too pliant, he cannot fulfill his mission. On the other hand, if the relationship between the superintendent and the board devolves into a battle of wills, with accusations from one side that the superintendent is autocratic and insular, and from the other side that the board is seeking to micromanage the school system, an unproductive situation develops.

The court also heard enough evidence to convince it that the relationship between the board and Grissett was, for some years, mutually unsatisfactory on this front, and thus credits the motivation of some board members to, at all costs, avoid selecting a candidate with a domineering or confrontational, "take it or leave it" style, as genuine and valid.

When these additional factors are added to the mix, the court still cannot say that the disparities between Hall's and Gardner's or Connell's overall qualifications are so apparent as virtually to jump off the page and slap one in the face. The court therefore cannot say that race was a motivating factor in McLain's decision to favor Gardner and then Connell over Hall in his machinations or the board's ultimate decisions to choose Gardner and then Connell.

Moreover, even if race had been a motivating factor, the board as a whole still would have proceeded to hire either Gardner or Connell over Hall for legitimate, nondiscriminatory reasons. Again, for the reasons just given, the court cannot say that the disparities between Hall's and Gardner's or Connell's overall qualifications are so apparent as virtually to jump off the page and slap one in the face. Even Morris acknowledged that he would not have joined the vote of support for Connell "had she not been qualified." According to Morris, she made a good impression upon him at her interview, showing great enthusiasm for her work, and displaying good communication skills; she was pleasant, and demonstrated a vision for the future of the school system. Morris also found Gardner both highly qualified and personable.

Hall also challenges the board's decision to select someone outside the school system. There are legitimate reasons why the board could find it preferable, all other factors being equal, to go outside the system, as Whigham and others attested to. Likewise, there are legitimate reasons to prefer working with someone who is long-

used to the system and most familiar with it. Every choice has its advantages and drawbacks. Thus the court gives little weight to the fact that views about this "insider v. outsider" factor diverged among board members, when it appeared to be just one factor in the mix, and not anyone's preferred controlling reason for selecting or ruling out any of the candidates. In addition, whatever evidence there may be that some board members gave thought to whether an outsider would be preferable, it tends to predate the withdrawal of Dan Payant as a candidate, Payant being both local and white. Hall did not satisfy the court that this criterion was spuriously introduced into the mix at a point when he was the sole remaining insider, and for the purpose of stacking the deck against him.

Hall sought to characterize the majority board members' character judgments of the candidates as a "contest of personalities," where white board members' shared perception that they would not get along very well with him as superintendent (at least by comparison with Gardner or Connell) was itself a vestige of the culture of white supremacy. In his view, his assertive style or forthright character might just be undesirable or threatening to them *because* possessed by a black person. The evidence would have carried weight if Hall had presented additional evidence that these white board members looked favorably on an assertive style or forthright character in a white candidate. Hall was unable to bring this evidentiary point home.

Hall also strove to bolster his interpretation of the board members' actions and motives with additional, highly circumstantial evidence that his race did not just figure improperly in their decision, but was the main impediment to his being hired. First, he presented, through expert reports and testimony, an abstract overview of the history, the culture, and the psychological attitude of white supremacy in Alabama. Hall demonstrated, as if any demonstration were required, that there exists today a legacy of the history of discrimination and racial segregation in Alabama. The board wisely did not challenge that characterization of Alabama's distant and more recent history. Then, Hall tried to link this history to the personal "upbringing," that is, the education, socialization, and acculturation of the white board majority, to show how the attitude of white supremacy conditions, or rather infects, their decision-making. Hall explored whether these board members socialize with blacks, worship with blacks, employ blacks in positions of authority in their personal businesses, permit their children to form close friendships with blacks, and so forth.

Each of these board members acknowledged that the society he grew up in retained and exhibited signs and features of segregation; however, each of them also claimed that he personally had managed, through the influence of broad-minded, spiritually tolerant, parents or other individuals, and as a result of his education and life experience, to outgrow and overcome any residual taints from that atmospheric prejudice and segregationist culture. Hall has presented nothing upon which this court could rely to discredit these assertions—either evidence that these board members had not overcome these taints (such as that these individuals, in any way or at any time, and in particular in the superintendent search, exemplified, through their words, actions, or decisions, the culture of white supremacy that has historically stained the social fabric of Alabama) or that, as a given fact, it would be impossible to overcome them. The burden was upon Hall to convince the court

that these particular individuals both carried within them the taints of the attitude of white supremacy, and allowed those taints to color and shape their choice of superintendent.

Moreover, assumptions about individuals based on cultural generalizations must be viewed with extreme suspicion. It is the very assumption that persons are, inevitably, readily identifiable as typical examples of a particular culture or creed, that defines a stereotype, and reveals prejudice in the mind of a proponent of that stereotype.

### V.

Under Title VII, plaintiffs may prevail by showing that defendants engaged in a pattern and practice of intentional disparate treatment of members of their own race. This approach can extend, for instance, to defendants' employment decisions. "To prove a ... pattern and practice of discrimination, a [plaintiff] must prove 'more than the mere occurrence of isolated ... discriminatory acts;'" in addition, that plaintiff "must 'establish ... that racial discrimination was the [employer]'s standard operating procedure—the regular rather than the unusual practice.'" *Shuford v. Alabama State Bd. of Educ.*, 846 F.Supp. 1511, 1521 (M.D.Ala.1994) (quoting *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977)). Hall advances the novel theory that the legacy of white supremacy in Alabama has resulted in a statewide pattern and practice, or standard operating procedure and policy, of not appointing black superintendents in majority white school districts.

The novelty of this theory stems, first, from treating the independent appointment decisions, reached by ostensibly autonomous boards of education in different cities and counties across the State, as a unified or interrelated initiative, as if all these boards were either directed by, or themselves tantamount to, a single state actor or employer. In other words, Hall would like laterally to transfer or assign the wrongful motives of any and all school boards in Alabama, along with the motives of any other state actors who may be implicated, to *this* board.

Alternatively, by clothing his pattern-and-practice argument in the vestments of segregation and its vestiges, Hall is implicitly treating the history of discrimination in the school systems of Alabama as itself a pattern and practice of race-based decisions, with race-based appointment of superintendents being one strand in that pattern. Hall posits in a brief that he "has adduced evidence demonstrating that the State of Alabama, acting through its state educational officials and local political subdivisions, including the Talladega County Board of Education, is maintaining vestiges of segregation with respect to the appointment of local superintendents of education. This establishes a pattern and practice of racial discrimination." Thus, according to Hall, the duties of state agencies and entities, whose past decisions and policies have contributed to the legacy of segregation, to take positive steps to eliminate any remaining vestiges of Alabama's former de jure dual-system of education, include a duty to hire qualified black superintendents in white majority school systems. That is why Hall's Title VII legal arguments borrow so heavily from desegregation jurisprudence: "If policies traceable to the de jure system are still in force and have discriminatory effects, those policies too must be reformed to the extent practicable and consistent with sound educational practices." *United States v. Fordice*, 505 U.S. 717, 729, 112 S.Ct. 2727, 2736, 120 L.Ed.2d 575 (1992). *See also Freeman v. Pitts*, 503 U.S. 467, 485, 112 S.Ct.

1430, 1443, 118 L.Ed.2d 108 (1992) ("The duty and responsibility of a school district once segregated by law is to take all steps necessary to eliminate the vestiges of the unconstitutional *de jure* system. This is required in order to ensure that the principal wrong of the *de jure* system and stigma inflicted upon the race disfavored by the violation, is no longer present.").

This pattern-and-practice theory fails. First, Hall presents no evidence at all of complicity between local boards and state officials in the creation or maintenance of the current statutory framework for local appointment of school board superintendents. Instead, again, Hall falls back upon the history of white supremacy in Alabama and the de jure segregation of its school systems to infer an intent to perpetuate the vestiges of discrimination in this context. But, as already shown, reliance upon a socio-historical theory of racist conditioning, based upon the fact that certain local, white decision-makers may have, in common, been raised in a segregated environment, does not demonstrate that their decisions today reflect a state-wide policy or practice of discrimination.

That is not what the vestige analysis of the Supreme Court, in cases like *Fordice,* entails. The Court's concern is by necessity much more narrow. In *Fordice,* as stated, the Court held that a challenged policy or practice must be traceable to the defendant's past segregative decisions or acts in order to charge that defendant with affirmative responsibility to eradicate remaining vestiges of segregation. 505 U.S. at 727–28, 112 S.Ct. at 2735–36. While in moral terms the aphorism "the sins of the parents will be visited upon their children" might seem sagacious, without a connection to past practices, and without a showing that the persistence of prejudice can be equated with a policy that unites or

links decisions made by disparate local officials, this court cannot identify a legal wrong, as opposed to a moral one, for which to scrutinize defendants. We are all moral agents responsible for eliminating "vestiges" of all sorts of prejudice from our hearts; but in only certain conscribed areas may we, as a society, assign legal responsibility upon one another to do so.

To be sure, state actors subject to terminal school desegregation orders have affirmative duties to demonstrate to the court that they have taken all necessary steps to eradicate vestiges of segregation, before they may obtain complete or partial relief from those orders. *Missouri v. Jenkins,* 515 U.S. 70, 88–91, 115 S.Ct. 2038, 2049–50, 132 L.Ed.2d 63 (1995). However, such duties cease upon a court's declaration of unitary status for the relevant school system. In the local offshoot from litigation in *Lee v. Macon County,* 267 F.Supp. 458 (M.D.Ala. 1967), Talladega County was declared unitary a decade ago, and so this is not even a tried and true vestige case. *See Lee v. Talladega County Bd. of Educ.,* 963 F.2d 1426, 1428 (11th Cir.1992), *cert. denied,* 507 U.S. 910, 113 S.Ct. 1257, 122 L.Ed.2d 655 (1993); *Elston v. Talladega County Bd. of Educ.,* 997 F.2d 1394, 1401 (11th Cir.1993). Because the analysis in *Fordice* does not therefore apply, and Hall cannot show his non-appointment is traceable to a vestige of the former segregated system, he also lacks standing to plead a vestige claim based on conduct of other boards, in other cities and counties, against other black candidates, for their offices of superintendent of education. *Harris v. Evans,* 20 F.3d 1118, 1121 (11th Cir.), *cert. denied,* 513 U.S. 1045, 115 S.Ct. 641, 130 L.Ed.2d 546 (1994); *see Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 220–21, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974). Therefore, the board's residual lia-

bility in this area ended with Talladega County's attainment of unitary status, and with it ended any corresponding responsibility to eliminate vestiges of the State's former public school segregation, root and branch.

Even if the board had remaining duties to desegregate, Hall's evidence of neglect or dereliction of such duty amounts to the single fact that no black superintendent has ever been appointed (at least on a non-interim basis) in a white-majority school district in Alabama. Hall presents no evidence about the number of black applicants in Talladega County or other white-majority localities, or their relative qualifications, nor does he even challenge the hiring process prior to the selection of a superintendent from among finalists. Hall's single piece of statistical evidence is insufficient to show a pattern or policy of racial discrimination, be it segregation or something else. Even if Hall could designate the Talladega Board, throughout its history, as a single entity or actor, there is no hiring history in Talladega County within the last 20 years from which to discern a pattern or practice.

The vestige theory in desegregation cases, which grew out of the articulation of students' rights to a nonracial educational environment, has never been applied to the appointment of superintendents. *See, e.g., Freeman,* 503 U.S. at 486, 112 S.Ct. at 1443 (duty to ensure that school attendance, faculty, staff, transportation, extracurricular activity, and facilities, are now all "free from racial discrimination"); *Lee v. Macon County Bd. of Educ.,* 267 F.Supp. 458 (M.D.Ala.) (three-judge court), *aff'd sub nom. Wallace v. United States,* 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967) (requiring school construction and consolidation, hiring and placement of teachers, school transportation, desegrega-tion plans for local school systems, equalization of faculties; but no finding or directive regarding superintendents). This, however, does not mean that it could not apply. But Hall speculates broadly about, but does not show, any concrete relationship between an inveterate tendency to segregate whites and blacks in school, and the race of a school superintendent; that is, that the superintendent position is one of the "measure[s] of the racial identifiability of schools in a system that is not in compliance with *Brown [v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ]." *Freeman,* 503 U.S. at 486, 112 S.Ct. at 1443.

Contrasting this case with *Knight v. Alabama,* 787 F.Supp. 1030 (N.D.Ala. 1991), *aff'd in relevant part,* 14 F.3d 1534 (11th Cir.1994), brings this point home. One of the plaintiffs' claims in *Knight* was that "the limited number of faculty and administrative positions held by blacks at [historically white universities in Alabama] is a vestige of de jure segregation which encourages and perpetuates a dual system of higher education." *Id.* at 1173. Their argument was that such disproportionate numbers contribute directly to the racial identifiability of the schools, and also contribute indirectly, by allowing the state to "announce that some of its colleges and universities are intended for attendance by white students." *Id.* The focus of this aspect of *Knight* was upon the rights of students to integrated education and educational opportunity; "the focus is on factors which influence student choice," to ensure that "students have a truly unfettered choice of where to attend school." *Id.* at 1359. "In sum, the obligation of the state and its institutions is to eliminate root and branch, to the extent practical, the vestiges of segregation which continue to have an impermissible impact on the exercise of student choice." *Id.* at 1360.

The *Knight* court found that the "continued and uninterrupted dominance of white control of a university's administrative structure is as clear a manifestation of vestiges of the prior dual system of segregation as survives in Alabama." *Id.* at 1191–92.

Hall has not shown that the race of the superintendent contributes to the racial identifiability of a school system, and affects the choices of students as to where they may attend school, even though the continued racial identifiability of school systems may, in some manner, contribute to, or be statistically linked to, the race of an appointed superintendent. If it does so contribute, it is not as a vestige of segregation. There is no evidence that the race of a superintendent in any school district limits or segregate the educational choices of students and parents on the basis of race. Not all traces and residue of racism and the so-called culture of white supremacy may be deemed vestiges of segregation.

Furthermore, the *Knight* court looked at the nationwide pool of qualified candidates for teaching positions, to gain perspective on whether schools were culpable for perpetuating the vestiges of segregation by falling down on recruitment efforts. Hall offers no such evidence about qualified black candidates for superintendent positions. But the court also said that individual employment discrimination claims of faculty were not part of the lawsuit: "Suffice it to say that this lawsuit is not about employment discrimination but about desegregation." *Id.*

Hall's theory reaches further than to neighboring local boards, and Talladega County boards of the past. He also claims this board shares any duties to desegregate that remain with state educational officers. The court shares this view, to an extent. *See Lee v. Lee County Bd. of Educ.*, 963 F.Supp. 1122, 1128 (M.D.Ala. 1997) (explaining history and nature of pervasive, dual control of Alabama's school systems at state and local levels).

Hall claims that the Talladega Board is, hydra-like, imputedly responsible for a statewide policy or practice of reserving for white persons all superintendent-of-education positions in white-majority school districts in Alabama. The involvement of the State Superintendent's office in this sorry history is well-documented and undeniable. Because of their efforts to impede and prevent the compliance of local school boards with desegregation orders issued by the federal court, the State Board and Superintendent were brought into the *Lee v. Macon County Board of Education*, 267 F.Supp. 458 (M.D.Ala. 1967), beginning in the mid–1960's. The court found that these state officials had asserted general control and supervision over all the public schools throughout the State of Alabama in order to continue the operation of a racially-segregated school system. *See Lee v. Macon County Bd. of Educ.*, 231 F.Supp. 743, 745 (M.D.Ala.1964) (three-judge court) (per curiam); *see also Lee v. Macon County Bd. of Educ.*, civil action no. 604–E (M.D.Ala. March 31, 1970) at 2 (three-judge court). As stated, a school system is granted unitary status only once the offending parties have adequately demonstrated to the court that they "have complied in good faith with [a] desegregation decree since it was entered and [that] the vestiges of past discrimination ha[ve] been eliminated to the extent practicable." *Freeman*, 503 U.S. at 492, 112 S.Ct. at 1446 (quoting *Board of Educ. of Oklahoma City Pub. Sch. v. Dowell*, 498 U.S. 237, 249–250, 111 S.Ct. 630, 638, 112 L.Ed.2d 715 (1991)).

Therefore, were it the case that the appointment of only white superintendents in white-majority school systems is a ves-

tige of, and perpetuates, the history of segregation in the educational system of Alabama; that these monochromatic appointments are due to a statewide policy or practice, implicating, at least in part, state officials, and are not simply the cumulative result of independent decisions made by isolated local school board officials; and that Talladega County remains a non-unitary school district, the court would have at least some basis for concluding that the board has affirmative duties to eliminate this vestige, and for exploring the manners in which it could fulfill those duties. But, as discussed earlier, the first proposition rests on a false analogy, the second is theoretically bold but short of factual support, and the third is counterfactual.

### B.

Hall's final theory is of intentional discrimination under the § 1981 and the thirteenth and fourteenth amendment as enforced through § 1983. But this theory fails for the same reasons that his Title VII theory (which is also based on intentional discrimination) fails.

An appropriate judgment will be entered.

Done, this the 27th day of December, 2001.